**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Crim. No. 2:19-cr-00222-GZS |
| | ) | |
| **JEREMY HUGH ROGERS** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Jeremy Hugh Rogers respectfully requests that this Court issue a sentence at the bottom of what he believes to be his sentencing range in this case, 33 to 41 months. If the Court believe the range is higher than this range, then Mr. Rogers requests the Court to depart downward from the applicable guideline range to the range requested by Mr. Rogers. In support of this request, Mr. Rogers submits this sentencing memorandum.

SUMMARY OF THE CASE

On or about August 12, 2019, Jeremy Rogers made several drunken videos that he thought were funny. In one of those videos, which he sent directly to friends, Mr. Rogers was seen wearing a mask while holding a firearm. He loads a magazine into the gun and says, "man, I'm tired of this shit, I'm going to fucking Walmart." In a second video he can be seen holding the same gun, which he calls "Bella" and says, "do you like my new Walmart killer." Five days later, he sends the videos to a "Facebook group conversation" with another photo where he is holding a rifle and with the text "who's with me?" Rogers has admitted to making the videos, which he made while he was intoxicated, and sending them to friends as a joke. He had expressed similar dark humor to friends in this conversation before, but one of those friends didn't find these particular videos funny and reported them to law enforcement officials.

The day before Rogers' arrest, law enforcement officials traced the video back to Mr. Rogers, whom they determined lived in Rockport. Because Mr. Rogers mentioned

"Walmart" in the video, out of concern but with no specific location referenced, local law enforcement and Walmart management decide to not immediately evacuate the store in Thomaston, the closest one to Mr. Rogers last known location, but instead reduce its hours from 10pm to 9pm. No other steps were taken. The Walmart reopened at its regular hours the next day.

In the afternoon of August 22, 2019, Mr. Rogers was arrested by state and federal officials and charged with state charges. Six firearms were found at the residence in which he was staying – all belonging to the property owner. More videos were found on Mr. Rogers' phone where he was holding and operating some of these weapons, though none in manner that would have been illegal for someone legally permitted to do so. He was charged by the U.S. Attorney's office with one count of Felon in Possession of a Firearm under 18 U.S.C. § 922(g)(1) on September 30, 2019 and had an initial appearance in federal court on October 3. He was indicted on that count on December 13, 2018 and ultimately pled guilty on February 20, 2020. This case is now ripe for sentencing.

PERSONAL BACKGROUND

To say Jeremy Rogers was not raised in a happy home understates the tragedy of it. His father was an abusive alcoholic who took out his anger on his wife and his children. As the older male child, Jeremy bore the brunt of that abuse and developed survival responses including a calloused approach to life and a dark humor in response. The marriage eventually ended, and Jeremy left with his father for New York and his two sisters remained with their mother in Connecticut. While living with his father in New York, Jeremy was exposed to events far beyond what kids should experience. He saw his father's drug abuse and domestic violence directed at his father's girlfriend, herself a drug addict. He was assaulted and abused by his father's drug dealer whom his father let stay in the home in exchange for drugs, including an incident where a gun was held to Jeremy's head. He

eventually fled the home to a friend's house and was ultimately taken out of state by family member.

The horrors of his childhood left their scars. Jeremy Rogers has been diagnosed with multiple mental health conditions: bipolar disorder (mixed), impulse control disorder, depression and PTSD. He at times has been medicated with a wide array of overlapping prescriptions but he does not care for how they affect him. Jeremy's first thoughts of suicide at the age of 10 led to his first hospitalization in Connecticut. It would not be the last time he was hospitalized due to mental health issues, nor would it be the last time he tried to kill himself. Around that time, he started experimenting with tobacco, marijuana, and alcohol. He eventually wound up in the juvenile system at age 14, but was released to the care of his grandmother, with whom he lived for a few years. His grandmother for a short time was a stabilizing force in Jeremy's life until her death when he was in his late teens.

Jeremy has tried to establish an adult life with little success. He hasn't remained gainfully employed for most of his working life. He has had a few relationships, but unfortunately, as often is the case for children of unstable homes, they have been tumultuous. He has two young children, ages 3 and 4, with whom he has not seen in a while. During the interview with probation, Jeremy stoically talked about his past horrors, but in talking about his children, his voice broke. He hopes he can be part of their life, but his incarceration and their mother have made that difficult.

Jeremy's mother told counsel that she always said to him that the crazy and provocative things he said would get him in trouble. This wasn't what she had in mind when she said it. Jeremy admits he says and does dumb things. He likes to shock people and is quick to say something without taking the time to think about it. He is part of various Facebook groups that share content that many people would find obnoxious and gross, and those reaction held appeal from him, even more than the content itself. He lacks any the self-control necessary to regulate those impulses and is now feeling the repercussions.

PLEA AGREEMENT

The parties have agreed to make to the Court these recommendations for purposes of

the Court's sentencing calculations:

1.  The base offense level is 20 under U.S.S.G. § 2K2.1(A)(4)(B).

2.  Mr. Rogers is subject to an enhancement of 2 levels under U.S.S.G. § 2K2.1(b)(1)(A)
    because of facts suggesting he had possession of between 3 and 7 firearms.

3.  Mr. Rogers has accepted responsibility sufficient to reduce his offense level by 3
    pursuant to U.S.S.G. § 3E1.1.

4.  Mr. Rogers has agreed to waive any sentencing appeal if the Court orders
    imprisonment of 46 months or less.

SENTENCING GUIDELINE CALCULATIONS

Mr. Rogers believes that based on the above recommendations and his particularized

facts, he has an offense level of 19 and his criminal history falls within Category II. This

would make his guideline range 33-41 months. Mr. Rogers is asking the Court to give him a

sentence on the lower end of this guideline range, 33-36 months.

**Objection No. 3: Specific Offense Characteristics.**  Mr. Rogers disagrees with the

conclusion of the Revised Presentencing Report and Addendum ("PSR") he possessed a

firearm in connection with another felony offense under §2K2.1(b)(6)(B) and is therefore

subject to another 4 levels giving him a total offense level of 23. At a category II criminal

history, this offense level would increase his guideline range to 51-63 months.

The analysis of the PSR on this point is flawed in both applying the Federal Sentence

statutes and its application of Maine state law. First, there is not sufficient evidence before

the Court to establish the "connection" requirement of §2K2.1(b)(6)(B). "Subsections (b)(6)(B)

and (c)(1) apply if the firearm or ammunition facilitated, or had the potential of facilitating,

another felony offense or another offense, respectively." *See commentary to §2K2.1.* While Mr.

Rogers is seen in possession of a weapon in the videos, he does not directly offer those

weapons as the basis of any "threats," such as by brandishing them in a way that directly

conveys a threat to a particularized person. *See United States v. Hill*, 583 F.3d 1075, 1078 (8th Cir. 2009) (reaching for a firearm in a waistband while physically struggling with officers connected to committing felony resisting arrest). He does not draw a clear connection by his words or acts related to the gun or his possession of it and the allegedly threatened party, Walmart or its shoppers. The passage of time between the making and sending of the video undermines the "connection" between the act of possessing the weapon and what could constitute a threat under the state statute. The gun possession itself does not help facilitate terroristic acts or threats to either the viewers of the video, Mr. Rogers' friends, or to Walmart or its shoppers. Lacking that facilitation, §2K2.1(b)(6)(B) cannot be used to increase Mr. Rogers' offense level.

Second, the PSR fails to make the necessary connection between Mr. Rogers' actions and alleged culpability under the state statute. It is not in doubt that Mr. Rogers has been charged in state court in Knox County with two counts[1] relevant to this analysis, (1) Terrorizing under 17-A MRS § 210(1)(B) and (2) Terrorizing with a Dangerous Weapon under 17-A MRS § 210 (1)(A). Maine state law provides:

> A person is guilty of terrorizing if that person in fact communicates to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life, against the person to whom the communication is made or another, and the natural and probable consequence of such a threat, whether or not such consequence in fact occurs, is:
>
> A. To place the person to whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed.
>
> B. To cause evacuation of a building, place of assembly or facility of public transport or to cause the occupants of a building to be moved to or required to remain in a designated secured area.

---

[1]     A third count is the state equivalent of the charges Mr. Rogers is facing here, Illegal Possession of a Firearm, 15 MRS § 393(1)(A-1) and wouldn't be considered *another* felony offense.

Count 1 is a Class C felony and relates to the allegation that because of the videos Mr. Rogers made, the Thomaston Walmart was evacuated when it was closed one hour early. Count 2 is elevated to a Class C felony because of the presence of the weapon. These charges are still pending. There isn't sufficient evidence before this court to find him of having committed these acts.

To find §2K2.1(b)(6)(B) applies, Court must answer the question: what is a threat under Maine Law? Several preliminary facts are important to note up front. First, Mr. Rogers sent these videos to his friends directly. He did not send them to Walmart. Nor did he send them with any instructions to pass them on to Walmart or any other entity where it could be expected it would reach either Walmart or any other public officials such as law enforcement. Second, he did not distribute these videos widely, rather, he sent them in a limited distribution, private communication. Third, the forum on which it was sent, Facebook, was known by Rogers to be a venue in which he would send and receive wild and outlandish ideas, ideas that would shock and offend. It was a closed forum, however.

Communications, including those which are alleged to be threats, have to be viewed through the lens of a free speech analysis. "[I]nsofar as that statute punishes 'the fact of communication', it projects immediate dangers of impairment of the freedom of speech guarantees of the First-Fourteenth Amendments to the Constitution of the United States." *State v. Sondergaard*, 316 A.2d 367, 368–69 (Me. 1974) (addressing 17 M.R.S. § 3701 which has been repealed and replaced by 17-A M.R.S. § 210). Threats are not protected, but for a communication to be "a 'threat' [it] must involve more than a message of 'menace of destruction or of injury'; it is also an indispensable feature of a 'threat' that its 'promise of evil' must be in a context of circumstances by which it gives rise to reasonable likelihood that 'alarm' or 'fear . . . to his disquiet' will be induced in some person." *Id.* at 369

*State v. Sondergaard* is premised under a prior terrorizing statute, but there the Supreme Judicial Court found an indictment fatally flawed when it alleged a threat was

made about a person to a third party without reference to the effect of the threatening communication on the hearer or the object of the threat. It concluded such an attenuated statement lacking in the "context of circumstances" to assess the "promise of evil" was not prohibited by the terrorizing statute at the time. *Id.* at 369.

Later after the statute was replaced by 17-A MRS § 210, it contained language speaking of the "natural and probable consequences" of communication to put someone in "reasonable fear." It was then that the case cited in the PSR, *State v. Fisher*, 398 A.2d 402 (Me. 1979) was issued. It is illustrative of how the communication must be analyzed by the particular facts around which it was made. There, the defendant called into the request line for a radio disc jockey and part-time news announcer to state "that there was a simulated bomb in the Courthouse, and that unless all the prisoners of the Somerset County Jail were released, that a real bomb would go off." *Id.* at 403. This communication was quickly relayed to State Police. *Id.* In fact, shortly before the call, "a shoe box containing a battery wired to some wooden sticks" had been found in the Courthouse. *Id.* at 404. When the defendant argued the connection between Fisher and the radio disc jockey lacked the "promise of evil" to the disc jockey, the Supreme Judicial Court disagreed.

> The additional circumstances shown, here, that would be likely to induce alarm or fear in the recipient of the communication are: (1) the communication was made to a radio disc jockey and part-time news announcer over his "request" telephone line at the radio station; (2) the menace of evil contained in the communication was to the Courthouse, a building where many persons will be transacting business, some of them public officials performing important public duties. Since these circumstances show danger to persons engaged in the performance of the public's business, it is reasonably likely that a responsible disc jockey and news announcer, whose job it is to hold himself out before the public as interested in matters of public concern and as sensitive and responsive to their impact on the public welfare, will become "alarmed" or experience "fear . . . to his disquiet." Further evidence that this consequence was reasonably to be expected is what actually happened in the present instance. Upon receiving the communication, O'Donnell forthwith left his post, and describing the communication he had received as a "bomb threat", told others to call the State Police.

*Id.* at 405. Because Fisher directed the threat with intent and in a manner where "the natural and probable consequences" were to cause fear in the disc jockey, it fell within the definition of the statute and the Maine Supreme Judicial Court upheld the jury verdict. *Id. See also State v. Michaud*, 473 A.2d 399 (Me. 1984) (where the natural consequences of a threat made to other law enforcement officers about law enforcement in general and a police chief by name was to put the police chief in fear of that threat).

While the retrospective fact that someone contacted law enforcement because of the videos could be evidence of "fear," it cannot resolve the issue. The effect of statement on a third-party listener is far from certain.

> If, idealistically, each human being should strive to love every other as himself, the realities of day-to-day living do not justify the imposition of criminal penalties on a basis which attributes a universal empathy of one human being for the potential plight of any or every other human being.

*Sondergaard*, 316 A.2d at 370. The result cannot be the sole way to analyze whether an action fits with the bounds of the terrorizing statute. It must be factually specific to each case, and here, Mr. Rogers has always maintained meant the videos to be a joke. While his mental state towards the communications is not controlling, it does bear on the "promise of evil" on which the Court should be concerned. What is more telling, though, is that he intended for them to be private. They were sent to friends who have no connection to the supposed subject matter – the Thomaston Walmart. Nor is there any indication they, unlike the recipient of the communication in *Fisher* who was a news reporter and radio host, were people who were in a position where they would be responsible for reporting to authorities when they received questionable or concerning materials. There was nothing in the communications suggesting or directing them to relay communication on to another party – such as a courthouse or jail staff, or members of law enforcement. Finally, there is no specific indication the content of any of the videos was directed at *any* particular party, much less the Thomaston Walmart. The videos lack any specificity for it to "be likely to induce alarm of

fear in the recipient of the communication" as to any Walmart, much less the Thomaston one. *See Fisher*, 398 A.2d at 405. Law enforcement who received the message from one of Mr. Rogers' friend made the leap based on these vague videos, and in doing so created the circumstances on which they charged him with terrorizing.

The above analysis applies to both the pending state charges. Yet, the charge dealing specifically with the "evacuation" of the Thomaston Walmart under 17-A MRS § 210(1)(B) is flawed in that the Thomaston Walmart was never evacuated. Walmart and law enforcement decided that they would reduce the hours of the Thomaston Walmart closing at 9pm, rather than 10pm. This action cannot rise to the level of an evacuation when they learned of the "threat" sometime earlier in the day. Such a conclusion was further when the Walmart reopened at its regular time the next day even though nothing had changed. Mr. Roger's had not been arrested and was presumably still presenting whatever type of threat that allegedly existed the day before.

Because neither of the allegations of terrorizing can stand on their face, they should not be used as an elevating factor in the "Specific Offense" calculations under §2K2.1(b)(6)(B).[2]

**Objection 5, Potential Variance Factors**. The PSR mentions for the Court's consideration Mr. Rogers' views on race and religion, particularly Judaism. It is inappropriate, however, to use these views to impact Mr. Rogers' sentence. It isn't clear if Mr. Rogers believes the things that he said or if they were said for their shock value. Either way, it is a viewpoint and neither the attorneys, nor probation, nor even the Court should consider those views as a sentencing factor whether they agree with them or find them repellant. "Traditionally, sentencing judges have considered a wide variety of factors in

---

[2]     The Government's sentencing memo states that Mr. Rogers intends to plea to one of the two terrorizing charges charges in the Knox County case. *See* Gov't Sent. Memo. p.1-2 [ECF Doc #44]. Whether or not this is true, this court must make its own determination as to whether §2K2.1(b)(6)(B) should apply.

addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant." *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). This holds particularly true when motive for the sentencing charge is being considered. *Id.* "But it is equally true that a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge." *Id. (citing Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L.Ed.2d 309 (1992)) (evidence the defendant was a member of a white supremacist prison gang was inappropriate to be raised during sentencing phase).

Mr. Rogers is not charged with a crime of malice, only one of possessing a weapon when he is not lawfully authorized to do so. His views unrelated to motive or intent to that crime should not be considered.

OTHER SENTENCING FACTORS /
REQUEST FOR DOWNWARD VARIANCE

If the Court agrees with Mr. Rogers' above analysis and finds a range of 33-41 months, then he offers these factors in support of his request for being sentenced at the bottom of this range. If, however, the Court agrees with the recommendation in the PSR for the 4-level enhancement under §2K2.1(b)(6)(B), and sets Mr. Rogers' sentencing range at 51-63 months, then Mr. Rogers respectfully requests that this Court issue a sentence below the sentencing range as the advisory guideline range is not compatible with the sentencing factors set forth in 18 U.S.C. § 3553. *United States v. Booker*, 125 S.Ct 738 (2005).

**Disadvantaged Childhood, Victimization, and Lack of Guidance as a Youth.** It is proper for this Court to consider Jeremy Rogers' disadvantaged childhood, his victimization, and his lack of guidance as a youth as grounds for a departure. "It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens." *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, J. dissenting. In *United States v. Germosen*, 473 F. Supp. 2d 221 (D. Mass 2007), the defendant had a guideline range of

37-46 months for conspiracy involving heroin importation. He was given a sentence of 2 years of probation with 6 months confinement. This was justified, in part, because the defendant had overcome difficult circumstances from his youth. *See also United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood—at some level of severity—can impair a person's mental and emotional conditions"). Thus, district courts have commonly granted sentencing reductions when a defendant was victimized as a child. *See, e.g., United States v. Walter*, 256 F.3d 891 (9th Cir. 2001) (combination of brutal beatings by defendant's father, introduction of drugs and alcohol by his mother, and, most seriously, the sexual abuse by his cousin, which the defendant suffered at young age, constituted the type of extraordinary circumstances justifying consideration of the psychological effects of childhood abuse and diminished mental capacity under § 5K2.13).

Additionally, Mr. Rogers' exposure to domestic violence and abuse at the hands of his father are proper factors to consider. *See United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991); *United States v. McBride*, 511 F.3d 1293 (11th Cir. 2007).

**Age.** Mr. Rogers was 25 years old when he created these videos. As was discussed earlier, Jeremey Rogers was born into a life of great disadvantage. By any measure his youth was awful and provided little means or skills for becoming a well-adjusted adult. Under the Guidelines, "[a]ge (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines." U.S.S.G. § 5H1.1.

A defendant's youth is also a valid consideration in sentencing. *See Gall v. United States*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-

five …. [T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.") (quoting sentencing court); *Roper v. Simmons*, 543 U.S. 551, 567 (2005) ("Today our society views juveniles, in the words Atkins used respecting the mentally retarded, as categorically less culpable than the average criminal…. A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions…. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult …. The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.").

District courts have departed downward based on a defendant's youth and immaturity. *See, e.g.*, *United States v. Dean*, No. 15-5172, 2015 WL 5294745 (6th Cir. Sept. 10, 2015) (affirming child pornography sentence where district court varied downward twenty-four months in part because of the defendant was only twenty-one years old when he committed offense); *United States v. Montanez*, 2007 WL 2318527 (E.D. Wis. Aug. 9, 2007) (imposing sentence of fifteen months where Guidelines were forty-six to fifty-seven months where the defendant's prior convictions primarily occurred when defendant was very young and court noticed difference in his maturity at time of sentencing); *United States v. Naylor*, 359 F. Supp. 2d 521 (W.D. Va. 2005) (imposing non-career offender sentence of 120 months, rather than 188, because of defendant's youth at the time of priors).

**Lack of Criminal Intent**. While there is no dispute Mr. Rogers intended to possess the weapons at issue, there is no clear intent to convey a threat with respect to the videos he made that brought him to the attention of law enforcement. The Court should give at least

*some* consideration to that fact. *See United States v. Frappier*, 377 F. Supp. 2d 220 (D. Me. 2005) (imposing a sentence of twenty months where the Guidelines recommended forty-one to fifty-one months for being a felon in possession of a firearm based, in part, on the conclusion that the defendant did not possess weapons for any illegal purpose but to teach sons how to use a rifle); *United States v. Handy*, 2008 WL 3049899 (E.D.N.Y. Aug. 4, 2008) (court imposed thirty months rather than Guidelines range of thirty-seven to forty-six months for twenty year-old found in possession of a firearm that he did not know was stolen, and which he believed to be inoperable, in an environment where finding a gun on the street was like finding cash).

**Chance for Rehabilitation.** Even though Covid-19 has diminished access to programs in the Cumberland County Jail where Mr. Rogers has been held since October 2019, he has found ways to move in the right direction. He enrolled in several available rehabilitative programs, including Prime for Life, a pre-treatment program challenging common beliefs and attitudes that directly contribute to high-risk alcohol and drug use.

He also spoke to Probation about wanting to be part of parenting and co-parenting programs when in BOP custody so he is ready to take more of a role in his children's lives. Mr. Rogers' life has been an unstable one. With support, he can reintegrate in their lives and be a positive force.

## CONCLUSION

The guiding principle for sentencing can be found at 18 U.S.C. § 3553(a) which states that a court "shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection" (emphasis added). The defendant requests that the Court impose a sentence of 33-36 months with a period of supervised release, with all the conditions outlined in the presentence report and be housed at the federal facility in Texas near his children. A sentence of 33-36 months is sufficient, and not greater than necessary, when considering all the reasons stated above.

Submitted, this 9th day of November, 2020

/s/ James M. Mason, Esq.
Attorney for Jeremy Rogers

<u>CERTIFICATE OF SERVICE</u>

I certify that on this day, I filed the foregoing Defendant's Sentencing Memorandum using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

/s/ James M. Mason, Esq.
Attorney for Jeremy Rogers